## Case No. 5,815.

### GRIFFIN'S CASE.

[Chase, 364; 2 Am. Law T. Rep. U. S. Cts. 93; 8 Am. Law Reg. (N. S.) 358; 25 Tex. Supp. 623; 2 Balt. Law Trans. 433; 3 Am. Law Rev. 784.] [1]

Circuit Court, D. Virginia.    May Term, 1869.

RECOGNITION OF STATE GOVERNMENT — FOURTEENTH AMENDMENT—VIRGINIA — GOVERNMENT OF, AFTER END OF CIVIL WAR—EX POST FACTO LAWS.

1. The government established at Wheeling, Virginia, soon after the secession of the state of Virginia, having been recognized by the executive and legislative departments of the national government as the lawful government of Virginia, this recognition is conclusive upon the judicial department.

2. This government was in contemplation of law, the government of the whole state of Virginia, though excluded as the government of the United States itself was, from the greater portion of the territory of the state.

3. A construction which must necessarily occasion great public and private mischief, must never be preferred to a construction which will occasion neither, or neither in so great degree, unless the terms of the instrument absolutely require such preference.

4. The prohibitory provisions of the fourteenth amendment to the constitution of the United States, did not, instantly, on the day of its promulgation vacate all offices held by persons with-

1 [Reported by Bradley T. Johnson, Esq., and here reprinted by permission. 2 Am. Law T. Rep. U. S. Cts. 93, 3 Am. Law Rev. 784, and 8 Am. Law Reg. (N. S.) 358, contain only partial reports.]

in the category of prohibition, and make all official acts performed by them since that day, null and void.

5. A person convicted by a jury, and sentenced in court by a judge de facto, acting under color of office, though not de jure, and detained in custody in pursuance of his sentence, can not be properly discharged upon habeas corpus.

[Cited in Sheehan's Case, 122 Mass. 449.]

6. G. a colored man is indicted and tried in the circuit court for Rockbridge county, Virginia, for shooting with intent to kill, convicted and sentenced to confinement in the penitentiary for two years. The court was presided over by a judge disqualified to hold office by the fourteenth amendment to the constitution of the United States, but he had been in office two years before the amendment was adopted. G. applied to the United States circuit court for Virginia, to be discharged on habeas corpus. *Held*, he can not be discharged.

[Cited in Re Osterhaus, Case No. 10,609.]

7. When the functionaries of the state government, existing in Virginia at the commencement of the late Civil War took part, together with a majority of the citizens of the state, in rebellion against the government of the United States, they ceased to constitute a government for the state of Virginia which could be recognized as such by the national government.

8. It is clear that if the government instituted at Wheeling, was not the government of the whole state of Virginia, no new state has ever been constitutionally formed within her ancient boundaries, for the existence of the state of West Virginia depends on the consent of Virginia.

9. When the state government, recognized by the United States, was transferred from Alexandria to Richmond, it became in fact what it was before in law, the government of the whole state; as such it was entitled under the constitution to the same recognition and respect in national relations as the government of any other state.

10. The ratification of the fourteenth amendment to the constitution of the United States, was officially promulgated by secretary of state on July 28, 1868.

11. Persons in office by lawful appointment or election before the promulgation of this amendment, were not removed therefrom, by the direct and immediate effect of the prohibition to hold office contained in the third section.

12. Legislation by congress was necessary to give effect to the prohibition by providing for such removal.

13. The exercise of their several functions by these officers until removed in pursuance of such legislation is not unlawful.

14. Of two constructions, either of which is warranted by the words of an amendment of a public act, that is to be preferred which best harmonizes the amendment with the general tenor and spirit of the act amended.

15. The whole spirit of the federal constitution is against ex post facto laws, or bills of attainder in form of trials by jury, and denies to the legislature power to deprive any person of life, liberty, or property without due process of law.

16. A provision which at once without trial deprives a whole class of persons of offices held by them, for cause, however grave, is inconsistent with this spirit and general purpose, and therefore no such construction can be given the third clause of the fourteenth amendment.

17. In the judgment of some enlightened jurists, its legal effect was to remit all other punishment. Such was certainly its practical effect.

[Appeal from the district court of the United States for the district of Virginia.]

Caesar Griffin, a negro, was indicted in the county court of Rockbridge county, for an assault with intent to kill. He removed his case as under the law he had the right to do into the circuit court for that county, and was there tried by a jury which found him guilty and assessed his punishment at imprisonment for two years in the penitentiary. He was accordingly sentenced by the court to that imprisonment. While on his way thither, in the custody of the sheriff of Rockbridge county, he sent out this writ which was served on the sheriff. That officer produced the petitioner in the district court then in session in Richmond, and made return to the writ that he held him by virtue of the conviction and sentence of the circuit court for Rockbridge county, making the record of the trial and conviction there a a part of his return. This return the petitioner traversed, denying that there was any court or judge in Rockbridge county as pretended by said pretended record, and that the paper exhibited was any record as alleged. The state of Virginia appearing by the attorney-general, Mr. ——, Judge H. W. Sheffey, the judge of the circuit court for Rockbridge by Bradley T. Johnson, Esq., and the sheriff by James Neeson, Esq. they joined issue on this traverse. The petitioner then proved that Judge Sheffey had been a member of the house of delegates in 1849. That in 1862, he was speaker of the house of delegates, and that his votes were recorded for affording men, money and supplies to support Virginia and the Confederate States, in the war then flagrant with the United States. It was admitted that he was duly appointed on February 22, 1866, by the then government of Virginia, to be judge of the circuit including the county of Rockbridge; that he immediately entered on the duties of that office, and that he has ever since and still is discharging the functions of the same.

The cause was argued at great length in the district court, before the district judge in December, 1868, who ordered the discharge of the petitioner, whereupon an appeal was prayed by the sheriff under the habeas corpus act of 1867 [14 Stat. 385], to the circuit court, and the petitioner admitted to bail. Before the circuit court could meet other writs of habeas corpus were sued out by other parties convicted of felonies, two of them of murder, on the same ground as in this case, and the petitioners were discharged. A motion was then made by James Lyons, Esq. in the supreme court of the United States for a writ of prohibition against the district judge, to restrain him from further exercise of such power. The supreme court advised on the motion, and never announced any conclusion, but shortly afterward the chief justice opened the circuit court at Richmond, and immediately called up the appeal in Griffin's Case. This

statement is necessary for a full understanding of the pregnancy of the chief justice's statement that the supreme court agreed with him as to the decision he rendered in this case. In consequence of the failure to oust the state officers disfranchised under the fourteenth amendment by these and similar judicial proceedings, congress in February, 1869, passed a joint resolution directing that all such officers should be removed by the military commanders of military districts into which the late Confederate States had been divided. Thus all the old officers of the state government of Virginia were removed except a very few, and new ones appointed not obnoxious to the denunciation of the federal bar—the supreme court of appeals of Virginia; the judges thereof having been removed by the major general commanding, he appointed as judges in their stead, a colonel of his staff, and two others, who had held or did then hold commissions in the United States army. The president judge of the court performed his functions and drew his pay as colonel and judge advocate on the staff, overlooking the execution of the laws of the military, and at the same time those of presiding judicial officer of the state.

Mr. Bundy, for petitioner.

The first question to be met in the argument of this case, is the question of the power of this court or of your honor as circuit judge, sitting at chambers, to interpose the arm of federal authority and grant us the relief which we ask: Whether, or not, this court would have a right, independent of any express grant of power in the statute, to interfere for the protection of citizens of the United States who were held in custody in violation of the constitution or laws of the United States, is a question which, happily for the patience of the court, we are relieved from considering at all by the act of February 5, 1867, under which this proceeding is brought, the important section of which is as follows: "Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that the several courts of the United States, and the several justices and judges of such courts within their respective jurisdictions, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus, in all cases where any person may be restrained of his or her liberty in violation of the constitution or of any treaty or law of the United States, and it shall be lawful for such person so restrained of his or her liberty to apply to either of said justices or judges for a writ of habeas corpus, which application shall be in writing, and verified by affidavit. and shall set forth the facts concerning the detention of the party applying, in whose custody he or she is detained, and by virtue of what claim or authority, if known; and the said justice or judge to whom such application shall be made, shall

forthwith award a writ of habeas corpus, unless it shall appear from the petition itself that the party is not deprived of his or her liberty in contravention of the constitution or laws of the United States. Said writ shall be directed to the person in whose custody the party is detained, who shall make return of said writ, and bring the party before the judge who granted the writ,. and certify the true cause of the detention of such person within three days thereafter, unless said person be detained beyond the distance of twenty miles, and if beyond the distance of twenty miles and not above one hundred miles, then within ten days, and if beyond the distance of one hundred miles, then within twenty days. And upon the return of the writ of habeas corpus, a day shall be set for the hearing of the cause, not exceeding five days thereafter, unless the party petitioning shall request a longer time. The petitioner may deny any of the material facts set forth in the return, or may allege any fact to show that the detention is in contravention of the constitution and laws of the United States, which allegations or denials shall be made on oath. The said return .may be amended by leave of the court or judge before or after the same is filed, as also may all suggestions made against it, and thereby, the material facts may be ascertained. The said court or judge shall proceed in a summary way to determine the facts of the case, by hearing testimony, and the arguments of the parties interested; and if it shall appear that the petitioner is deprived of his or her liberty in contravention of the constitution or laws of the United States, he or she shall forthwith be discharged and set at liberty. And if any person or persons to whom such writ of habeas corpus may be directed shall refuse to obey the same, or shall neglect or refuse to make return, or shall make a false return thereto, in addition to the remedies already given by law, he or they shall be deemed and taken to be guilty of a misdemeanor, and shall on conviction before any court of competent jurisdiction, be punished by fine not exceeding one thousand dollars, and by imprisonment not exceeding one year, or by either, according to the nature and aggravation of the case. From the final decision of any judge, justice, or court, inferior to the circuit court, an appeal may be taken to the circuit court of the United States for the district in which said cause is heard, and from the judgment of said circuit court, to the supreme court of the United States, on such terms and under such regulations and orders as well for the custody and appearance of the person alleged to be restrained of his or her liberty, as for sending up to the appellate tribunal a transcript of the petition, writ of habeas corpus, return thereto, and other proceedings as may be prescribed by the supreme court, or in default of such, as the judge hearing said cause may prescribe, and pending such proceedings or appeal, and un-

til final judgment be rendered therein, and after final judgment of discharge in the same, any proceedings against such person so alleged to be restrained of his or her liberty in any state court, or by or under the authority of any state, for any matter or thing so heard and determined or in process of being heard and determined, under and by virtue of such writ of habeas corpus, shall be null and void."

It will be observed that the statute is so framed as to exclude, so far as language is able, all doubt or cavil as to what is the legislative will. No restrictive or ambiguous words, no qualifying clauses, no circuity of language, are employed. The fullest and largest powers are conferred upon the several courts of the United States, and the several judges and justices thereof: and to leave nothing to doubt as to the powers granted being cumulative, and in enlargement of the powers heretofore vested therein, it reads, "in addition to the authority already conferred by law shall have power to grant, &c." The necessary effect of such general and inclusive language is to render inapplicable to this case much of the judicial authority which two centuries of adjudication and discussion have thrown upon the nature and use of this ancient and beneficent writ.

From 1627, when the first statute of personal liberty—that of Charles Second of England—was wrung from kingly prerogative, down through our own Revolutionary annals, and at intervals ever since, crises have occurred in our national affairs which have called for the enlargement of the powers of courts by means of this remedial writ of habeas corpus, and so necessary a part has it become of our judicature that it has not inappropriately been termed the "water of life to redeem from death of imprisonment." Although the constitution (article 1, § 9) declared "that the writ of habeas corpus shall not be suspended, except when in cases of rebellion or invasion the public safety may require it," yet without an act of congress to give it "life and activity" it would only exist as a bare right without the appropriate means and rules for its exercise: Hence the judiciary act of 1789, prescribed the jurisdiction of the federal courts and justices under this writ. The fourteenth section of this act provides—"That all the before mentioned courts of the United States (supreme court, circuit court, and district court), shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law, and that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus, for the purpose of inquiry into the causes of commitment, provided that writs of habeas corpus shall in no case extend to prisoners in jail, unless when they are in custody under and by color of

the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." This statute was deemed sufficient for all the purposes of security to personal liberty, until the year 1833, when the hostile attitude assumed by South Carolina towards the general government, became the occasion for the passage of the act of March 2, 1833 [4 Stat. 634], which has especial reference to commitments by the courts and magistrates of the several states. It provides as follows: "That either of the justices of the supreme court, or a judge of any district court of the United States, in addition to the authority already conferred by law, shall have power to grant writs of habeas corpus in all cases of a prisoner or prisoners in jail or confinement, where he or they shall be committed or confined on or by any authority of law, for any act done or omitted to be done in pursuance of a law of the United States, or any order, process or decree of any judge or court thereof, anything in any act of congress, to the contrary notwithstanding." Again, in 1842, the arrest and trial of Alexander McLeod by the state authorities of New York, upon the charge of burning the steamer Caroline in the Niagara river, and the apparent insufficiency of the statute to enable the general government to maintain good faith towards foreign nations, where the jurisdiction of a state had first attached, forced congress to pass the act of August 29, 1842 [5 Stat. 539], by which power was given justices of the supreme court and judges of the district courts of the United States to grant this writ, for the purpose of bringing before them all persons who are committed or confined, or in the "custody of" the authority of any state, on account of any alleged order or sanction of any foreign state, the validity or effect whereof depends upon the law of nations. During the late war, the powers of the federal courts were again still further enlarged by the act of March, 1863, to extend to a class of offenders who had fallen into military custody, and who, but for this act devised for their relief, might languish in prison without a trial.

Next in the order of legislation by congress is the act of February 5, 1867, under which this proceeding is brought, and this act, like its predecessors, is sui generis, and expressly framed for the emergency that called it forth. What was that emergency? And what the proper scope and purpose of this act? Blackstone lays down the rule for the interpretation of statutes in his Commentaries (volume 1, marg. pp. 50–60) as follows: "We must consider the cause that moved the legislature to enact the law. The fairest and most rational method of devising the will of the legislator is, by exploring his intentions at the time when the law was made by signs the most natural and probable, and these signs are either the words, the context, the subject matter, the effect and con-

sequences, or the spirit and reason of the law." The same rule is laid down by the United States supreme court in Ex parte Milligan, 4 Wall. [71 U. S.] 114. They say—"In interpreting a law the motives which must have operated with the legislature in passing it are proper to be considered." With this rule for our authority, let us glance at the condition of the country, at the date of the passage of this act (Feb. 5, 1867), and therefrom seek for the motives of congress in passing it.

At the surrender of the armed forces of the Rebellion, the officers and soldiers were paroled to go home, there to remain free from molestation as long as they continued faithful to the laws of the land. Beyond this nothing was settled by the surrender. Over all the territory comprised within the ten states lately in arms, civil governments and all political institutions were completely demolished. The then incumbents of state and municipal offices had sworn to support the constitution of the "Confederate States of America" against all enemies, and especially against the authority of the United States. The surrender of her armies left the legislative, executive, and judicial departments of each state, and of the central Confederate power, without the breath of life. Over the whole territory civil government was prostrate, and the inhabitants reduced to disorganized communities. Then followed two years of fruitless experiment with the "policy" of the president. No power able to speak the dead to life had raised its voice until congress passed the series of reconstruction acts over the presidential veto by the constitutional majority of two-thirds, and then, for the first time, the disjointed parts of the framework of southern society began to come together, and the revolted states were put in train for re-admission to all the rights and privileges in states of the Union. The grounds upon which congress based its action are clearly set out in the preamble to that act, and are as follows: "Whereas, no legal state governments or adequate protection for life or property now exists in the rebel states of Virginia, &c.; and, whereas, it is necessary that peace and good order should be enforced in said states until loyal and republican state governments can be legally established, Therefore, be it enacted, &c." That act first sweeps away the debris of the civil wreck that occupied the territory of the rebel states, and supplies its place by a military establishment with the fullest powers over life, liberty and property, only limited by the conditions, "that no cruel or unusual punishment can be inflicted," and no sentence of death can be carried into effect without the approval of the president. So complete is the substitution of the military for the civil power by the scope and tenor of this act, that without the special discretion given the district commander in the third section, to "allow local civil tribunals to take jurisdiction

of, and to try offenders," it was foreseen that he would be deprived of a useful means, familiar to the people, for the prevention and punishment of crime. But this permission to the district commander to "allow the local tribunals," &c., in no degree relieves him from his official responsibility to the government for the faithful execution of the laws. These local tribunals act only by his permission, and their acts have no validity or effect except as he "allows" and approves them. This being the character of the tribunals known as "courts," within this state—little more than ministerial agents or agencies of the military commander—it is plain that many of the presumptions and maxims of the law that obtain in communities where the structure of civil society has remained undisturbed for many years, and where courts exist not by the orders of a military officer, but proprio vigore, do not here apply; for example, under the latter conditions of society, there is a presumption of law, that a "man acting in a public capacity is duly authorized so to do," and that "the records of a court of justice have been correctly made according to the rule 'res judicata pro veritate accipitur,' " that "the decision of courts of competent jurisdiction are well founded, and their judgments regular and legitimate," &c., yet these presumptions, resting upon the general principle that the continued existence and regularity of long-established institutions will be presumed until the contrary is shown, can have no proper force within the unreconstructed states. But no correct interpretation of this act is possible without taking into one view all the other acts constituting the series of reconstruction acts. The first in order of these is the civil rights bill, then the joint resolution of June 16th, 1866, submitting, for ratification, to the several states, the constitutional amendment known as the fourteenth article. Then follows the habeas corpus act, and lastly, the act of March 2, 1867 [14 Stat. 428], to "provide for the more efficient government of the rebel states," and the acts amendatory thereof. Of this series of reconstruction measures only two, the constitutional amendment, and the habeas corpus act, are permanent in their nature. The other two are mere scaffolding, to be removed when they have served their temporary purpose in building up the strong pillars of the constitutional amendment. Although a considerable period of time elapsed between the passage of the first and last of these laws, the congressional history of that period will show that they were under consideration by the national legislature at the same time, and each was passed in view to its mutual and combined operation with the others. In this relation, then, should they be interpreted by the courts.

The facts in this case, as set forth in the petition, are briefly these: Caesar P. Griffin was tried in September last upon a charge of felony, and thereof convicted by the circuit

court of Rockbridge county, Hon. Hugh W. Sheffey presiding as circuit judge. It is set out in the petition and fully proved upon the trial, that Hugh W. Sheffey falls within the class of persons who are expressly disqualified and forbidden by the fourteenth article of the amendments of the constitution from holding any office, civil or military, under the United States, or under any state. We claim, therefore, that being so disqualified to perform the functions of a judge, by constitutional prohibition, his acts as such judge are wholly null and void, and therefore, that the officer holding the petitioner in custody, having no valid authority in law for his detention, must be ordered by this court to discharge him. The return of the respondent merely sets out as his authority for holding the petitioner; the record of his trial, conviction and sentence: claiming for the court the authority of a de facto court, and for the record that it can not be disputed in any other court, whether state or national. The petitioner denies the truth of the return in toto, and reaffirms the allegations in his petition, thus putting squarely at issue both the legal validity and the authentication of the proceeding of the pretended court. The third section of the amendment provides that "No person shall . . hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath as a member of congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof; but congress may by a vote of two-thirds of each house, remove such disabilities." In the interpretation of this section of the amendment, it is important to know the proper and generally accepted meaning of the word "hold"—as upon the signification of that word much of the force of the argument rests. Webster defines the word, to hold "to stop, to confine; to restrain from escape; to keep fast, to retain," and he remarks—"It rarely or never signifies the first act of seizing or falling on, but the act of retaining a thing when seized on or confined."

I respectfully submit to the court the following propositions as applicable to this case, and as well founded in law: I. That the fourteenth article of the amendment acts proprio vigore, and without the aid of additional legislation to carry it into effect. II. That it is binding upon all courts, both state and national, and that every United States judge is required by his oath of office to take cognizance thereof. III. That the holding of the office of circuit judge by Hugh W. Sheffey, after the proper announcement that this amendment had been ratified, was a daily usurpation of office in open defiance of the highest law of the land. IV. That

Hugh W. Sheffey being so disqualified and prohibited from holding any office, he was not in law a judge, either de jure or de facto, and his acts as a pretended judge have no legal validity whatsoever, but are simply trespasses. V. That the act of February 5th, under which this proceeding is brought, authorizes this court to inquire into the authority by which the petitioner is deprived of his liberty, and to determine whether that authority is exercised in contravention of the constitution of the United States, and in such case to grant the prayer of the petitioner.

It is sufficient in support of the first proposition to cite the proclamation of the secretary of state, of the date of July 28, 1868, reciting among other things the joint resolution of the two houses of congress declaring the fourteenth article of the amendments duly ratified and adopted as a part of the constitution of the United States, and following with his own official declaration in these words: "And I do further certify, that the said amendment has become valid to all intents and purposes as a part of the constitution of the United States," and the formal recognition of the same fact by the judiciary in the person of the chief justice of the supreme court, in his charge to the grand jury at Wheeling, West Virginia, in August last. The second proposition is supported by the constitution itself (article 6, § 2), which declares—"This constitution and the laws of the United States which shall be made in pursuance thereof, and all treaties made under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." The truth of my third proposition necessarily follows from the two former.

The first serious difficulty is met in the support of the fourth proposition. We are met at the threshold of the inquiry with the objection that whatever may have been the personal disqualifications of Hugh W. Sheffey, his official acts are those of a de facto judge, and as such, they are shielded by the law from question in any other court, except upon writ of error or appeal. But this is to beg the whole question. Exactly what we are contending for, and have set up and proved in this case, is that Hugh W. Sheffey was not, on the day of the trial of the petitioner, a judge in any character, either de facto or de jure, being then expressly disqualified and prohibited from holding such office, and that his acts are purely trespasses. It will be observed that the objection is not that we do not go the right way about this inquiry, but that the petitioner can not make the inquiry at all. We will suppose that a subject of some foreign power had sat in Sheffey's place, and had been able by force or fraud to usurp the powers of a court for the time being, and had sentenced the petitioner to be hanged, and

this court had been called upon at the last hour to interfere by habeas corpus. Would it be a sufficient return to this writ to set out the record of his trial and conviction, attach thereto a seal, and under the protection of that seal, to claim for the court proceedings, whatever may have been their character, absolute immunity from investigation? and yet the objection must go so far as this or it is good for nothing; and this rule once adopted within the territory of Virginia, the habeas corpus act of 1867 becomes a dead letter, and there is absolutely no right of appeal to the federal courts in the very class of cases that this act was devised and intended to meet. Again, if this rule that we can not go behind a court record by this proceeding, is to prevail, what is to prevent Lynch law from overriding all legal authority: providing only, the "regulations" can obtain a court seal with which to cover the record of their violence? Suppose Judge Lynch were to open his court at some four corners within this state for the trial of a band of horse-thieves. The "jury" arraign the prisoners, hear the evidence, and condemn them to death; one of them has powerful friends who sue out a writ of habeas corpus in his behalf; he is brought before the United States circuit court, with the cause of his detention duly certified by the pretended officer, who sets out in his return that he holds the prisoner by virtue of a judgment and sentence of a "court" (meaning Judge Lynch's court), which has found him guilty of horse-stealing. Would this court be debarred from inquiry into the jurisdiction of such a judge, and from discharging the prisoner, merely because the mob have proceeded under the forms of law? and hence are a de facto court? And yet such a tribunal has as much claim to power as the circuit court for Rockbridge county. Both are illegal tribunals for want of judicial authority; and the judgments of both, however righteous in themselves, are absolutely void; for such a court has no more power to render a just than an unjust judgment, and no power at all to render either the one or the other, because both tribunals are forbidden by the supreme law of the land. No human being in this country can exercise any kind of public authority, which is not conferred by law, and under the United States it must be conferred by the special words of a written statute. While it is true that I have not been able to find any adjudicated case that could be followed as a precedent in the case now before the court, the sufficient reason for that is found in the fact that no historical parallel for the political and civil condition of this state is known to exist. For certain purposes Virginia is a conquered territory, while for certain other purposes she is held never to have severed her relations with the Federal government as a state. But whatever may be the present practical relations of the state to the general

government, the allegiance of the people comprised within her limits, was never successfully withdrawn. In the language of Chief Justice Chase, in Shortbridge v. Macon [Case No. 12,812], an opinion delivered in Raleigh, North Carolina, in June, 1867, under the reconstruction act. "On no occasion, however, and by no act have the United States ever renounced their constitutional jurisdiction over the whole territory, or over all the citizens of the Republic, or conceded to citizens in arms against the country the character of alien enemies, or to their pretended government the character of a de facto government."

But independent of the habeas corpus act, there are many decisions of authority that stop but little short of the extent to which we contend this right of one court to inquire into the legal authority of another should be carried. The supreme court of the United States in Williamson v. Berry, 8 How. [49 U. S.] 540, says: "It is a well settled rule in jurisprudence, that the jurisdiction of any court exercising authority over a subject may be inquired into in every other court where the proceedings in the former are relied upon, and brought before the latter by a party claiming the benefit of such proceedings. The rule prevails, whether the decree or judgment has been given in a court of admiralty, chancery, ecclesiastical court, or court of common law, or whether the point ruled has risen under the laws of nations, the practice in chancery, or the municipal laws of states." This court applied it as early as the year 1794, in the case of Glass v. The Betsey, 3 Dall. [3 U. S.] 7; again, in 1808, in the case of Rose v. Himely, 4 Cranch [8 U. S.] 241; afterwards, in 1828, in Elliott v. Piersol (in case of ejectment) 1 Pet. [26 U. S.] 328, 340. In the last case it is said—"Where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decisions be correct or otherwise, its judgment, until reversed, is regarded as binding in every other court. But if it act without authority, its judgment and orders are nullities; they are not voidable, but simply void." See likewise, Wilcox v. Jackson, 13 Pet. [38 U. S.] 499; Schriver v. Lynn, 2 How. [43 U. S.] 59; Lessee of Hickey v. Stewart, 3 How. [44 U. S.] 750; also, Serg. Const. Law, 286; U. S. v. Almeida [Case No. 14,433]; and Mead v. Deputy Marshal [Id. 9,372]; case of Ex parte Pleasants [Id. 11,225]; also case of Ex parte Randolph [Id. 11,558]. This right to inquire into the validity of a judgment has been so repeatedly exercised by all the states, that I do not deem it necessary to cite more than two or three cases. In Massachusetts the question was made in 1814. Com. v. Harrison, 11 Mass. 63. On the trial of this case, counsel for the defense cited the opinion of Kent, C. J., in Ferguson's Case, 9 Johns. 239, that the state courts have no jurisdiction in cases of this kind. The court answered very briefly, but emphatically—"This court has au--

thority, and it will not shun the exercise of it, on proper occasions, to inquire into the circumstances under which any person brought before them by a writ of habeas corpus is confined or restrained of his liberty."

While upon this general subject, what defects will render judgment and process absolutely void, I will cite two leading cases, that of Brooks v. Adams, 11 Pick. 441, where it is held that jurisdiction may be shown to be defective in the organization of the court, and Slocum v. Simms, 5 Cranch [9 U. S.] 363, where it is held by Chief Justice Marshall that a judgment may be defective in respect to the qualification of the officer, where a magistrate was held incompetent to sit in the discharge of a debtor under the insolvent laws of Virginia, and the judgment of discharge rendered by magistrates, of which he was one, was declared to be wholly void: and this too when this decision was against personal liberty, and its effect the recommittal of the bankrupt to prison, where the law should receive a restrained construction. See, also, Hill v. Wait, 5 Vt. 124, and Bates v. Thompson, 2 D. Chip. 96, for the effect upon a judgment where the justice is related to one of the parties, and therefore disqualified by statute. But it is sometimes said that the judges in Virginia, holding their offices directly under the authority of the military district commander, they are not accountable to any civil tribunal. The answer we make to this, is, that we are not trying nor seeking to try Hugh W. Sheffey. We are merely trying the effect of this judgment, and that depends upon his legal authority to make it. If he had no such authority—if he usurped a jurisdiction which the law had forbidden him any longer to exercise, then his acts are absolutely void, and no military order from whatever source can make them valid; for says the supreme court in Ex parte Milligan, 4 Wall. [71 U. S.] 120, 121, "The constitution of the United States is a law for rulers and people equally in war and peace, and covers with the shield of its protection all classes of men, at all times and under all circumstances." So that whatever may have been the right of the district commander to employ or "allow" courts of this character to try offenders before the ratification of the fourteenth article, he certainly had no such right or authority after the ratification of that article, because it then became a law to him as well as to the courts. The language of the third section of the fourteenth article is, that "no person shall hold any office, civil or military, under the United States or under any state." This language is in the alternative, and if the officer in question be found to belong to either the one or the other of these classes, then the constitutional prohibition applies, and the incumbent who falls into the disqualified class of persons, was on July 28, 1868, divested of his judicial powers and authority, and became that day, in the fullest sense of the word, functus officio. But it is sought to break the force of these deductions by the suggestion, that the constitution has no application nor force in the unreconstructed states. If so, when was it withdrawn by the general government, or when was it thrown off by Virginia? Did congress, by the act of March 2, 1867, design to withdraw the constitution from the states to which that act applies? It is not denied that such an act might have been done by the law-making power, but certainly it is not conceivable that it would be done by a mere implication, without express words of solemn enactment. And that it was not done, is sufficiently evidenced by the notorious fact that the highest court of the nation had under consideration at its last session, and still has, undecided, the question of the constitutionality of this very act. But it is an indignity offered to this court to assert that it is now sitting for a judicial district that is situated without the pale of the constitution, unless forsooth that pleasant fiction of the law of nations that clothes our ambassadors to foreign courts with an atmosphere of our own nationality can be applied to our federal judges, and they can be said to reside "near" the city of Richmond in the province of Virginia, as the former are said to reside "near" the court of St. James and St. Cloud. But the judge must then fetch and carry the constitution with him, for it is his own "vital breath," and his coming and going would indeed mark the summer and winter solstice of this dreary blank in the republic.

If, then, the constitution of the United States is in force within this state, and "is a law for rulers and people," the plain infraction of its provisions, by Hugh W. Sheffey, in trying and committing the petitioner, furnishes the occasion for which the remedy provided by congress in the habeas corpus act of February 5, 1867, may be rightfully invoked; for that act empowers judges and courts "to grant writs of habeas corpus in all cases where any person may be restrained of his or her liberty, in violation of the constitution of the United States." The objections to this theory are variously stated, but they can mainly be resolved into two, one of which, at least, is founded in a misapprehension of the effect and nature of this remedy. It is said by those whose dependence upon the honor or profits of office, seems to have quickened their sensibilities to the dangers of any scrutiny into their qualifications, that we cannot attack the authority of a judge in such a collateral proceeding; that our proper remedy is by proceeding in the nature of a quo warranto, and they add, that this can only be carried on by the supreme authority of the state. This has already been answered by showing that the object had in view by us, is not to unseat Hugh W. Sheffey, and no judgment of this court can have that effect. The public discussion of this question will doubtless tend to call public attention to the effrontery of his pretension that he can continue to perform the functions of a judge in

daily defiance of the supreme law of the land. But the direct and avowed purpose sought by this petition, is the release of Caesar P. Griffin from unlawful imprisonment, and beyond this the court is neither asked nor expected to go.

The remaining objection to granting the prayer of the petitioner is found in the principle sought to be applied to this case, that the acts of a "judge de facto, if within the rightful jurisdiction of the office he exercises, are as valid and binding as the acts of an officer de jure." The term "de facto" from being applied to officers acting colore officii, and with apparent authority of law, has in this argument been used to describe every species of pretender to official character, however disqualified or prohibited he may be by law. This is certainly a great latitude of interpretation, and must have the effect to obscure or destroy the original and true meaning of the expression. According to the argument upon the other side it seems only necessary, in order to establish for any man the character of a de facto judge, to prove actual manual possession of the bench, and control of the seal, no matter how obtained. This argument, if carried out, would give full faith and credit to judicial acts of a deposed judge, done after conviction of impeachment, or judgment of ouster in a proceeding by quo warranto, and provided only the pretender were bold enough, he might perpetuate his official character. In the 1st volume of J. J. Marshall's (Ky.) Reports (pages 206, 207) may be found the case of Hildreth's Heirs v. McIntire's Devisee, where Judge Robertson discusses at length the proper limits to be given to the use of the term "de facto" in a state that is under a written constitution. The case arose upon an attempt of the legislature of Kentucky to supersede the court of appeals, and to provide a new court in its place. Under the new law four judges were duly appointed, and organized by the appointment of a clerk. An appeal was taken from Bourbon county to the court of appeals, and by them dismissed, because the record was not filed with F. P. Blair, who was acting as clerk to them. A certificate of dismissal signed by Blair, as clerk of the court of appeals, was presented to the clerk of the court of Bourbon, and though objected to by the counsel of the appellants, was received and entered upon the record of the court, and thereupon a habere facias was directed to issue to carry into effect the original decree, to reverse which the appeal had been granted. Says the court—"The only question presented for our decision is whether the court erred in obeying the mandate of Messrs. Barry, &c., certified by F. P. Blair, and a solution of this question depends on another, viz., whether Barry, &c., were judges of the court of appeals, and Blair its clerk. Although they assumed the functions of judges and clerk, and attempted to act as such, their acts in that character are totally null and void, un-

less they have been regularly appointed under and according to the constitution. A de facto court of appeals cannot exist under a written constitution which ordains one superior court, and defines the qualifications and duties of its judges, and prescribes the mode of appointing them. . . Where there is a constitutional executive and legislature, there cannot be any other than a constitutional judiciary. Without a total revolution, there can be no such political solecism in Kentucky, as a de facto court of appeals. There can be no such court whilst the constitution has life and power. There has been none such."

With him, L. H. Chandler, U. S. Dist. Atty.; H. H. Wells, Military Governor of Virginia.

Bradley T. Johnson, for Judge Sheffey.

The petitioner in this case was regularly indicted, tried, and convicted in the circuit court for Rockbridge county, of a felony under the laws of Virginia, and sentenced, according to the verdict of the jury which tried him, to imprisonment for two years in the penitentiary. While on his way thither, in the custody of the sheriff of that county, in obedience to the mandate of the court and the requirement of the law, the steps of that officer are arrested by the writ of habeas corpus issuing out of this court on the petition of the party. He applies to be discharged from custody, alleging that he is detained under color of a pretended judgment —pretended to have been entered by a pretended court, presided over by a pretended judge. He then charges that Hugh W. Sheffey, who acted as judge on his trial, which took place since the adoption of the constitutional amendment, was in law no judge at all, he having been disqualified from acting after the adoption of the constitutional amendment known as the fourteenth article; Judge Sheffey having taken the oath to support the constitution of the United States, and acted in a legislative office in the state of Virginia, and afterwards aided the Rebellion. To the writ, the sheriff makes return, producing the prisoner, that he holds him by virtue of a conviction for felony, and sentence thereon, of the circuit court for Rockbridge county, and that he was on his way to take him to the penitentiary when the writ was served. He exhibits the record of trial, conviction, and sentence of the Rockbridge court as part of his return. The petitioner files a reply or traverse to this return, denying that there is any court as alleged, or any judge as alleged, or that the paper produced and exhibited as a record is any record as alleged.

On this traverse the state joins issue. The petitioner then offered evidence: 1. To prove that Judge Sheffey was a member of the house of delegates of Virginia in 1849; and, 2. That in 1862, being speaker of the then house of delegates, he voted men, money, and supplies to support the state of Virginia and the Confederate States, in the war then wa-

ging with the United States. To this evidence the state objected; but the court admitted it, and the state excepted. The petitioner then read from the journals of the house of 1849 and 1862 to prove these facts, and also by a former clerk of the senate who had been clerk since 1853, that it was the custom for members of the senate to produce to the clerk a certificate from a justice of the peace or other proper officer that such member had duly taken all the oaths required by the constitution to be taken. No evidence was offered that Judge Sheffey, as member of the house of delegates, took the oath to support the constitution of the United States. It was then admitted that the Hugh W. Sheffey mentioned in the journals of 1849 and 1862 was the same Hugh W. Sheffey who sat on the trial of the petitioner; and further it was admitted, that Hugh W. Sheffey was on the 22d day of February, 1866, duly appointed by the then existing government of Virginia to be judge of the circuit including the county of Rockbridge; that he immediately entered on the duties of that office, and that he has ever since, and still is, discharging the functions of the same. These are the facts on which the petitioner asks his discharge.

The proposition on which he bases his claim is this: That Judge Sheffey has been rendered ineligible as judge by the adoption of the constitutional amendment, and therefore all his acts since that period are void; in other words, that the acts of an officer illegally in office being void, the consequences of those acts are also void. A proposition so monstrous in its results, so extraordinary in its application to all the affairs of men, which strikes at the very foundation of civil society, deserves strict examination and careful investigation, if it be law. If it be not law, it must be peremptorily thrust out of a court of justice, branded with all the ignominy of judicial denunciation. If the acts of officers disfranchised by the constitutional amendment are void, and of no effect, then judgments rendered, decrees made, deeds acknowledged and recorded, wills proved, notes protested—all fall with the ineligible officer. If these acts of theirs are void, all acts are void; although qualified themselves, they may have been sworn into, appointed, or elected to office by disqualified officers. The source being corrupt, the whole stream of consequences partakes of that corruption. Disqualification from bribery, dueling, non-residence, age, citizenship, or alienage, all work the same result. If a judge is appointed by a legislature, some of whose members are disqualified from holding their seats, then his appointment, according to this argument, is void, and his acts are void. The legislature itself may all be eligible, but some members may have been elected by illegal votes. Therefore the acts of the legislature, being vitiated by the original taint of illegality, all the consequences flow from it. If a consti-

tution be adopted by illegal votes, then all officers under it become mere intruders and pretenders to official functions. The existence of this very fourteenth article itself may be attacked in precisely the mode the judicial functions of Judge Sheffey are sought to be invalidated. One of the state legislatures at least, adopted it by the votes of members who were afterwards declared ineligible, and their seats vacated; and under this theory of law, the inquiry might be pursued, until it was found that it had never received the assent of a sufficient number of legal legislatures composed of legal members duly sworn in by legal officers, and elected by legal voters. The statement of such a proposition is its own sufficient refutation. If it be true, no legal act, no legal existence anywhere is secure. All may be attacked by showing that somewhere, at some time, some person disqualified by law from holding office contributed by some official act to it. That established, the whole falls.

I propose to show that no such proposition has been sanctioned in any court for centuries of any such principle of law, and that an unbroken current of authorities in this country, and in England, against it, is never rippled by a dissenting or even objecting opinion from any court, any judge, or any law-writer. The writ of habeas corpus is the writ of right, say the fathers of the law; but it is in no case a writ of error, and it never had been used to review the decisions of other tribunals. From the earliest times down to later days it has been universally held that where the party applying for it appeared on his own application to be committed by the judgment of a court of competent jurisdiction, the writ would be refused him, or that where such commitment appeared on the return to the writ, that such return was conclusive. This is the settled law of habeas corpus in England and here. Crosby's Case, 3 Wils. 188; Ex parte Kearney, 7 Wheat. [20 U. S.] 45; Ableman v. Booth, 21 How. [62 U. S.] 506. The only inquiry that could be made was: 1. Had the court jurisdiction over the subject and the subject-matter? and, 2. Did that jurisdiction legally attach Sir William Chancey's Case, 12 Reporter [Coke] 82; Goldswain's Case, 2 W. Bl. 1207; Gardener's Case, Cro. Eliz. 821; 2 Hawk. P. C. c. 15, § 78; People v. Cassels, 5 Hill, 164? And this was the law of the federal courts under the act of 1789 [1 Stat. 73], which authorized them to issue writs of habeas corpus, "agreeably to the principles and usages of law." In the course of time, however, collisions became inevitable between the concurrent state and federal jurisdictions.

Parties might be deprived of their liberty contrary to the laws of the United States. The slow process of writ of error from the state courts contemplated by the judiciary act was utterly ineffectual as a remedy for such wrong, and the writ of habeas corpus,

the return showing the party to be held by judgment of a court of competent jurisdiction, could afford no relief. Besides, in many states the record on writ of error would disclose nothing contrary to federal laws and federal right. A party might be indicted, tried, and convicted for robbery, and the record would only show that charge, no bill of exceptions being allowed in criminal cases at common law, or in states adhering to common law. The appeal, therefore, to the federal tribunal would be vain, while in truth and fact the robbery for which the party was convicted was collection of federal taxes. To meet such cases, the jurisdiction in habeas corpus was extended by the act of 1833, which provided, that whenever any officer of the United States was in custody, for any act done or omitted to be done by federal authority, then the federal court might on habeas corpus inquire into all the circumstances of his committal or conviction, and vindicate his federal rights. This act extended over all officers of the Federal government, the perfect and complete panoply of the federal jurisdiction, and secured them perfect protection for all acts done by them in the execution of their office. Though passed to force South Carolina, attempting to nullify, it was never practically operative until applied to cases arising under those state laws which actually did, by personal liberty acts, nullify the laws of congress and the constitution of the United States. And the federal judges, without exception, applied the law, and protected officers of the United States in the discharge of their duties. They released them when held by state authority in defiance of their federal rights. U. S. v. Morris [Case No. 15,811]; Ex parte Sifford [Id. 12,848]; Ex parte Jenkins [Id. 7,259]. After this, however, it was found that other cases might arise requiring federal intervention to protect other cases of violated right. McLeod committed a felony within the jurisdiction of the state of New York, and was tried for it by the state authorities. The government of Great Britain, whose officer he was, assumed the responsibility of his act, and under the law of nations, the agent should have been released, and the principal alone held responsible. New York, however, refused to release McLeod, and in consequence, the act of 1842 was passed, extending federal protection to all aliens held anywhere, by any authority, in violation of treaty rights, or those under the laws of nations. Treaty rights, created by federal authority, or international rights, recognized and guaranteed by federal authority. This law also was to intervene the federal authority to protect federal rights. The act itself is in the main a copy of the act of 1833, so far as those provisions go, which give the federal courts the right to inquire into the cause of commitment. By these two acts of congress, therefore, the aegis of the federal power was thrown around its officers and those aliens partaking of its hospitality.

Those two classes alone were thus secured by this prompt and efficient remedy from any infringement of rights secured to them by the federal authority. They could not be obliged, when held to answer in a state court, to wait the slow process of trial there, appeal to the state supreme tribunal, and thence to the supreme federal court, with the certainty in many cases, as I have shown, of being unable to prove by the record in what manner their rights were injured. Whenever they were injured, habeas corpus afforded a remedy, simple and prompt. But no other person had such a right. A citizen of one state, going into another state, might there be molested in some mode contrary to his federal rights, and if his liberty was restrained, his only remedy was by process of appeal or writ of error. Prior to 1867, it was considered necessary to remedy this omission in the law. It was charged that many southern states, under the pretense of labor, police, and vagrant laws, were endeavoring to evade the force of the constitutional amendment abolishing slavery, and were shaping their policy so as to restore the substance of involuntary servitude, under the name of penalty for crimes. Therefore the act of 1867 [14 Stat. 385], was passed, extending the habeas corpus to all cases where any person was restrained of his liberty, contrary to the constitution, laws, or treaties of the United States. It is a copy of those provisions of the acts of 1833 and 1842, as to the right of the court to examine into the cause of detention, whether by judgment of a court or otherwise, and in effect strikes out the provisions limiting the application of the act of 1833 to officers of the United States, and of 1842 to aliens, and inserts, instead of those provisions, the words, "all persons restrained of their liberties, in contravention of the constitution, laws, or treaties of the United States." The federal protection before extended only to federal officers and federal guests, i. e., aliens, was now made to embrace all persons, citizen and alien, officers, and those who wanted to be officers, of the federal government; in fact, all mankind. "It brings within its scope," says Chase, C. J., "every possible case of privation of liberty, contrary to the laws, constitution, or treaties of the United States. It is impossible to widen the jurisdiction." Ex parte McCardle, 6 Wall. [73 U. S.] 326.

The writ of habeas corpus, therefore, when issued by a federal court, embraces every case where a person is alleged to be deprived of his liberty in contravention of the constitution, laws or treaties of the United States. And the court issuing the writ is authorized in every case to go behind every return, and to pass upon the facts in every case, and if it appear that the party applying is injured in his federal rights, then such court is authorized to protect him by discharging him, whether committed on a charge of, or on a conviction for, crime. Therefore, it only re-

mains to this court to inquire if this person, the petitioner, is deprived of his liberty, contrary to the constitution, the laws, or the treaties of the United States? Has he, by state authority, been injured in his federal rights? The first question that presents itself is, What are his federal rights? 1. Those secured by treaty or under the laws of nations do not apply in this case. 2. Those enuring to federal officers to be protected in their functions are not involved here. 3. The federal rights secured by the constitution to all persons are: (1) The right of every citizen of a state to be secured in those rights in every other state, which provision is universally construed to mean civil rights as distinguished from political rights. (2) The rights of trial by jury as secured by the reservations in the original amendments to the constitution. (3) The right to be secured against involuntary servitude, except as a punishment for crime. (4) The right to a republican form of government. In this proceeding, this court is to inquire if this petitioner has been injured in any of these federal rights? Has he been denied any of them? If, on a full investigation of all the facts, without regard to the form of the record, it is found that he is denied federal rights, then he is to be discharged; if not, he is to be remanded.

No question as to form of government, or to involuntary servitude, or to the rights of citizens of different states enjoying all the civil rights of citizens of this state, arises in this case, and therefore the first, third, and fourth sub-divisions of rights have no application. The only question to be considered is whether the petitioner has been denied his right to be tried by a jury? The universal judgment of all courts, federal and state, heretofore has been that this right is only to secure a trial by jury in federal courts. But for the sake of the argument, we concede that every person within the United States, has a right to the trial by jury, according to the course of the common law. This is the extreme proposition in favor of the petitioner, and although against the law, we concede it for the purpose of this argument. This court is therefore to inquire, whether the petitioner has been deprived of his right to a trial by jury, according to the course of the common law? Admitting that this is a federal right, we are limited to the inquiry as to whether it has been infringed in this case. It is charged that, although tried by jury, under a law denouncing a penalty against a felony, equally applicable to all persons, triable and punishable in the same way as to all persons, citizens, aliens or officers, without regard to color, state or condition, still, nevertheless, the judge being disfranchised by the constitution of the United States from sitting as judge, that the trial was no trial; was contrary to that constitution, and that thereby the petitioner was deprived of his federal rights, and denied a

trial by jury which implies the presence of a legal judge. That Judge Sheffey, being constitutionally ineligible from the moment of the adoption of the constitutional amendment, became eo instanti dead as a judge, and by no possibility could be author of a legal trial of any person.

I shall first admit, for the purpose of this argument in this place, that Sheffey was, by the adoption of the constitutional amendment on July 28, 1868, rendered ineligible for his office, and from that moment became, in law, incapable of holding it. This being admitted, for the sake of the argument, and also it being admitted in the cause, that he was appointed judge in 1866, and has ever since, and is now discharging the functions of judge, I shall prove: 1. That he was judge de facto when the judgment against petitioner was entered. 2. That the act of a judge de facto has precisely the same legal effect as that of a judge de jure. If one is binding, the other is, and that there is legally no difference between the acts of a judge de facto and of one de jure, except when those of a judge de facto may enure to his own advantage.

First. Was he a judge de facto? There is no better definition of an officer de facto than that laid down by Lord Ellenborough in the case of King v. Corporation of Bedford Level, 6 East, 368: "An officer de facto," says he, "is one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." And it plainly appears that Judge Sheffey was, and is, such an officer. No matter whether he be denounced by the constitutional amendment or whether he be disqualified by law, or ineligible to his assumed office, he was, and is, a judge de facto, having the reputation of being the judge he assumes to be, and yet, according to the assumption, is not a good officer in point of law. This, I think, is conclusive. At the time of this judgment he was judge de facto.

Next I will prove that as to the acts of an officer de facto and an officer de jure, there is no legal difference except where the acts of an officer de facto inure to his own benefit. Wherever they do, wherever they are tainted with selfish considerations, they are invalid, but whenever they inure alone to the benefit of the public, they are as good and binding as if done by a judge, anointed by oil which ever was poured on the head of a legitimate monarch by an archbishop consecrated through a line of a hundred predecessors.

It is a fundamental maxim, not of the law, but of civilized society, that the acts of officers de facto are valid. Without it, there would be no security for life, or liberty, or property. It took form and shape in a statute in the time of Edward as to the rights of a king de facto, but its foundation was beyond that. Without the rights of de facto governments, who would recognize the Norman titles against the Saxon barons? Who

the varying rights of York and Lancaster, or Tudor and Plantagenet, of king and commonwealth, and king again, of Stuart and Orange, or Stuart and Brunswick? Where would you find your resting place in the history of civilization? In the Roman empire? In its Gothic conquerors? In the house of Charlemagne? In that of Hugh Capet? In the Bourbon or the Buonaparte? The kingdom, the republic, the empire, the kingdom, the republic, the empire again. In 1789, in 1783, in 1800, in 1815, in 1848, or in 1852? When, where, and how, would you base your rights de jure? Brandenburgh rises on the ruins of other houses, as Hapsburg before it, and will fall again, as Hapsburg has done. The history of the world is the history of kingdoms and empires, and civilizations de facto, becoming de jure, because they are de facto.

Whenever a power, or a government, or an officer are able to maintain themselves in power, it becomes necessary for the peace, the progress, the development of society, that such government, power, or officer should be recognized pro tempore as the legal power, and full effect and validity be given to acts under it. This is the rule of law as well as the rule of reason. Governments acknowledge it. After the war of 1812, the supreme court of the United States decided that the port of Castine having been captured by the British, and held during the war, the British domination was to be considered de facto and pro hac, released the citizens of Castine from their obligations de jure, as citizens of the United States. U. S. v. Rice, 4 Wheat. [17 U. S.] 253. Subsequently, in the war of the South American republics, the secretary of state of the United States held that a sale of guano islands made by a de facto government to citizens of the United States, conveyed a title which the United States were bound to recognize and protect. The doctrine that acts of de facto officers are as valid as if by officers de jure, is undenied and undeniable. It is affirmed in Blackstone, Kent, and every elementary author, and illustrated in Bacon, Comyns, Viner, and every abridgment of the common law. I spare the court the recital from such authorities, and content myself with producing the adjudications of the older English courts and the latest American ones on these questions. I have with some labor compiled the decisions in all the states up to the present time, and instead of presenting the court with a mere reference to cases, have gathered the sense of each particular adjudication, to illustrate the general meaning and signification of the doctrine.

The whole uninterrupted current of decisions is that the acts of an officer de facto are good, valid, and binding. They can not be questioned collaterally, nor in any way, except in a proceeding against the incumbent of the office, to oust him therefrom. Whenever a party holds office, having, as Lord Ellenborough says, "the reputation of being the officer he assumes to be, although not a good officer in point of law," then, in such cases, his acts have precisely the validity and force as if performed by an officer de jure. A person by color of election may be officer de facto, though indisputably ineligible. Knight v. Corporation of Wells, 1 Lutw. 508; 16 Vin. Abr. 114. Where there was a bishop of Ossory, and another was installed bishop de facto, judicial acts of latter held good. O'Brian v. Knivan, Cro. Jac. 552. Where a steward of a manor, appointed without authority of law, yet acting as steward, and being de facto steward, his grant of copyhold land held good by Lord Bacon: "Acts done by one who keeps court as steward without authority, if they come in by presentment from the jury, are good." Harris v. Jays, Cro. Eliz. 699. A commission to take testimony executed by judges after the demise of James I., when their terms expired, and they were not judges, but acting without authority, was held good. The judges certified that "no inconvenience could arise on such proceedings before notice of the king's demise; but, if otherwise, it would draw in question many trials by verdict of nisi prius, and trials and attainders upon jail delivery; whereupon divers have been arraigned and executed since the king's demise." Sir Randolph Crew's Case, Cro. Car. 97. Officers de facto of corporation bind the corporation. Ang. & A. Corp. 280; Bank of U. S. v. Dandridge, 12 Wheat. [25 U. S.] 64. Whether sheriffs be de facto or de jure can not be questioned collaterally. Morse v. Calley, 5 N. H. 223. Acts of sheriffs de facto valid as respects third persons. Doty v. Gorham, 5 Pick. 487; Fowler v. Bebee, 9 Mass. 231; Com. v. Fowler, 10 Mass. 290; Buckman v. Ruggles, 15 Mass. 180. In action of ejectment the title of a constable who sold the land not to be questioned. Being de facto sufficient. Burke v. Elliott, 4 Ired. 355. In same action, title of register who registered the deed, not to be questioned. Gilliam v. Riddick, Id. 368. In action of trespass for seizing a hog by town commissioner. Acts of those holding de facto good. Commissioners of Trenton v. McDaniel, 7 Jones (N. C.) 107. In action against defendant for trespass, his acting as officer proves him officer de facto. Id. 375. Judicial act of an alderman de facto holding and exercising the office not under mere color of right, but possessing a commission on its face, constitutional and legal, can only be examined in a proceeding to which he is party, and in which he can be heard. Cornish v. Young, 1 Ashm. 153. Party relying on the record of a deed need not show that he who recorded it was an officer de jure—de facto is sufficient. Brush v. Cook, Brayt. 89. The acts of an officer de facto who comes into office by color of title are valid, as it concerns the public or third persons. McInstry v. Tanner, 9 Johns. 135. Where one acts under a colorable title

to an office, his title can only be examined before the supreme court, and that directly. McKim v. Somers, 1 Rawle, Pen. & W. 297. The acts of an officer de facto, whether judicial or ministerial, are valid, so far as the rights of the public or third persons having an interest in such acts are concerned; and neither the title of such an officer nor the validity of his acts as such can be indirectly called in question in a proceeding to which he is not a party. Plymouth v. Painter, 17 Conn. 586; Hoagland v. Culvert. 1 Spencer [20 N. J. Law] 387; Farmers' & Merchants' Bank v. Chester, 6 Humph. 458. An officer de facto holding colore officii is as well qualified to act while thus in office as if legally appointed and duly qualified. Smith v. State, 19 Conn. 493. The right of a person acting colore officii to the office in which he acts, can be tried only in a proceeding to which he is a party, directly presenting that question, and not in a collateral way, between third parties. Id. 499. A person acting as an officer under color of a commission is de facto such officer, until ejected by a proceeding having that object in view. His authority can not be questioned, in a collateral way, and his official acts, until ejected, are valid. Aulanier v. Governor, 1 Tex. 653. The regularity of the election or the qualifications of an officer can not be questioned collaterally. Bean v. Thompson, 19 N. H. 290. The general rule is that acts of officers de facto in which other parties or the public have an interest are valid. State v. Perkins, 4 Zab. [24 N. J. Law] 409. The acts of an officer de facto valid, and not to be questioned collaterally. State v. Brennan's Liquors, 25 Conn. 278. The official acts of an officer de facto can not be impeached collaterally. Stokes v. Kirkpatrick, 1 Metc. (Ky.) 138. The acts of officers de facto are valid when they concern the public or rights of third persons, who have an interest in the acts done. Venable v. Curd, 2 Head, 582; Patterson v. Miller, 2 Metc. (Ky.) 493; Gourley v. Hankins, 2 Cole (Iowa) 75. Acts of an officer de facto are valid when they concern the public or the rights of third persons, and can not be indirectly called into question in a suit to which said officer is not a party. It is only in a suit against him that his right can be questioned. Hooper v. Goodwin, 48 Me. 79. An officer who has entered on the discharge of the duties of his office is an officer de facto, and his eligibility can not be inquired into collaterally, though it may be by quo warranto. Satterlee v. San Francisco, 23 Cal. 314. The right to an office can not be determined by an action of replevin of its appurtenances. Desmond v. McCarthy, 17 Iowa, 525. A person elected as county judge for the full time may signify his refusal to qualify, and thereupon the office becomes vacant for that time, and an appointment may be made immediately, although, to prevent an interregnum, the old incumbent of the office is authorized to perform its

functions until his successor has qualified. State v. Washburn, 17 Wis. 658; People v. Bangs, 24 Ill. 187. Acts of officers de facto valid. Scadding v. Lorant, 13 Q. B. 697; 66 E. C. L. 686. Where a judge was ousted from office on quo warranto, held that his acts while illegally in office were binding and valid. People v. Bangs, 24 Ill. 184. Where the law under which a judge was appointed was held to be unconstitutional, and, therefore, his appointment void. Acts done by such judge held valid and binding. Taylor v. Skrine, 2 Tread. Const. 696. When a judge was ousted on quo warranto and a party sentenced to penitentiary by him while illegally in office was discharged on habeas corpus after the judgment of ouster on quo warranto, the supreme court of Wisconsin reversed the decision of the lower court discharging the prisoner, and remanded him to the penitentiary, on the ground that the acts of the judge de facto were good as to all the world, although he was afterwards regularly pronounced not to be legally in office. State v. Bloom, 17 Wis. 521.

These authorities fully establish my proposition, that the acts of a de facto judge are as valid and binding as if done by a judge de jure, except where such acts are for his own benefit. And hence it follows that this petitioner has not in any way been injured or denied his rights under the federal constitution, so far as being tried by a legal judge is one of those rights. For his trial by a judge de facto has precisely the same legal effect as if by a judge de jure. But another view is equally conclusive: Whether the legal state government of Virginia was overthrown on April 17, 1861, at Richmond, or on April 9, 1865, at Appomattox, makes no difference for the purposes of this argument. If the former, then the occupation of the territory of Virginia was a mere re-occupation, a re-possession, a re-extension of federal laws over territory from which they had been temporarily excluded by belligerent forces. The laws of Virginia of course remained intact and in full force and vigor. On the other hand, if the legal government fell at Appomattox, then the possession of Virginia was conquest. On conquest, the conqueror is bound to administer the laws of the conquered country until he provides another code for them. This doctrine Lord Mansfield lays down in Campbell v. Hall, Cowp. 205, where he enters into a detailed statement of the conquests of Great Britain. And in Sir Thomas Picton's Case, 30 How. St. Tr. 225, the lord chief justice acted on it by allowing proof that the Spanish law in the conquered island of Granada allowed torture to be administered, and that, therefore, its application by the British military governor was justifiable and legal. The law of Virginia being, therefore, in force fully and perfectly, the section relating to de facto officers (Code, 101), exactly establishes the law by statute, as I have proved it by prin-

ciple and authority. That section, in effect, declares that all acts of officers de facto shall be as valid and have the same effect as if done by officers de jure, except where such acts might inure to the benefit of such offi- cer de facto. By it, therefore, all questions as to the validity of the acts of Judge Shef- fey, or any other officer denounced by the constitutional amendment, are set at rest. All acts of all such officers are acts of officers de facto, and therefore are good and valid acts.

I have argued the case so far on the hypothesis that Judge Sheffey was in fact and in law rendered ineligible to office on July 28, 1868, and has ever since held office in defiance of law; and I have shown that even if he be disqualified for every cause known to the constitution and laws of Vir- ginia or of the United States, if he be an alien, has fought a duel, be a non-resident, over or under the legal age, and in addition to all of these disqualifications, all of which he unites in his own proper person, he is dis- franchised by the constitutional amendment, still, all his acts are good, valid and binding, and can never be challenged or questioned by reason of his said numerous disqualifica- tions. It is argued that the adoption of the constitutional amendment operates like a judgment of ouster on a quo warranto by a court of competent jurisdiction; and that, therefore, from the moment it goes into ef- fect, no person disfranchised by it can hold office colore officii, or can be an officer de facto. This would be true if the individual to which it was to be applied were desig- nated and named in the article itself. It would doubtless be competent for the sover- eign power to convict and punish individ- uals by name, without trial; but then like an act of attainder it must name those indi- viduals. Where a party is so specially at- tainted, the law operates at once on him like a judgment of an ordinary court. But un- til he is selected and condemned by name by due process of law, no judgment can have effect as against him. He must be person- ally condemned by an act of sovereignty like a constitutional amendment, or by a judgment of a court after trial and convic- tion. While, therefore, it may be true that a party condemned by a judge, ousted by name from office by a constitutional amend- ment, would be deprived of his liberty con- trary to the constitution of the United States, it is clear that, until a judge is thus ousted by name, either by a sovereign act of at- tainder without trial, or by a conviction aft- er trial, his holding office is still colore officii, and his acts those of a judge de facto. The constitutional amendment is a general act of attainder—a statute denouncing a general penalty for crime. The penalty applies to every person who is guilty; but his guilt can only be ascertained, the identity of the individual can only be made certain, the penalty applied to that particular individual,

only by due process of law—i. e., trial, con- viction and judgment. It might be compe- tent for a constitutional amendment to de- clare that A. B. had been guilty of murder, and should be hung. In such case, the con- viction of that individual would be final. But when it declares that all persons guilty of murder shall be hung, that penalty can only be applied to individuals according to law. Each person, before being hung, must be tried, convicted and adjudged that that particular penalty shall apply to him. The constitutional amendment only differs from a penal statute in this, that being ex post facto, it could only have become law by be- coming part of the 'constitution. No other authority but the sovereign power could enact it. It is, therefore, an ex post facto law—legal only because part of the consti- tution. But its provisions are general, like every penal statute denouncing a general penalty, which general penalty can only be applied to each particular case by due course of law, trial, conviction and judgment. No officer, therefore, holding office, who is in fact ineligible under the constitutional amendment, can be affected by it until its provisions are applied to him according to law, nor can his holding be contrary to the constitution until such application is legally made. So it is clear that the constitutional amendment does not affect officers now in office. Future federal legislation may pro- vide the mode of bringing it to operate on this class, but acting proprio vigore, it does not affect them. The deprivation of office is a punishment of the highest class. Taking that from a man which he has and enjoys, and is entitled to, and is in possession of, may be done as a punishment; but then it must be done according to law.

Garland's Case [4 Wall. (71 U. S.) 333] in the supreme court settled the law that test oaths were unconstitutional so far as they went to deprive him of his office of attorney, being ex post facto, and operating so as to make the party convict himself. This being the law, it must follow that a man enjoying the office of judge can not be deprived of it except by due process of law. No man, un- der the federal constitution, can be tried or convicted unless by a jury, and it is there- fore clear that the only mode by which the fact that any person holding an office is within the constitutional amendment is by the verdict of a jury, on an indictment for aiding in rebellion. Aiding rebellion is a crime, and can only be proved for the pur- pose of punishing the party, by the oaths of two juries, by an indictment, a verdict, and a judgment. That is the only evidence that the law knows, or can know, of guilt or criminality. That a party held an office, and took an oath to support the constitution, may be proved by the best evidence that can be had; but that he aided the rebellion can only be proved by the record of his conviction —where he was confronted with the wit-

nesses against him, was heard by the jury in his defense, and enjoyed all those protections and rights which the laws secure to parties charged with crime. It is clear that the constitutional amendment can operate on no man holding office when it went into operation, until such party is duly convicted of aiding rebellion, and even then it will require some process by which he can be ousted. Whether this can be done by the imposition of a test oath or not, it is useless now to inquire. It is certain that no means of any kind are provided for putting the amendment into operation. But further than this, it seems that Judge Sheffey is not in fact disfranchised. When he was in the legislature in 1849, the Code of 1819 was in operation; and by it no oath was required of members of the legislature to support the constitution of the United States. There is no proof in this cause that he ever took such an oath, and I am almost certain that, in point of fact, he never did take it. At any rate, it can not be presumed that he did take it when such tremendous criminal consequences are sought to be deduced from the taking of it. Being in office, every presumption is in favor of his being eligible. The burden of proof lies in those who charge his disqualification; and they must prove it. No presumption of law will make up for this deficiency of proof.

I have demonstrated: 1. That the only inquiry that can be made on the return to this writ is, whether the petitioner has, in the state court, been deprived of any federal right. 2. That, admitting Judge Sheffey to be disqualified under the constitutional amendment, he was still acting as judge, colore officii, and was judge de facto, and that his presiding at the trial as judge in no way contravened any federal right of the petitioner. 3. That therefore the petitioner must be remanded. 4. That Judge Sheffey, in fact, is not disfranchised under the constitutional amendment according to the proof in this cause. 5. That the only proof which is admissible of his aiding the Rebellion is the record of his conviction in a court of competent jurisdiction. 6. That the constitutional amendment can not operate proprio vigore on persons holding office at the time of its adoption, but requires further action by congress to prescribe the mode by which it can be applied to such persons. These propositions are conclusive, and the party must be remanded. He must, however, be remanded to the custody of the sheriff of Rockbridge county for another reason. Admitting even that his conviction is illegal, and is no conviction, still it appears by the return that he is charged on the oaths of twelve men with a felony committed in Rockbridge county. In any event, therefore, he must be remanded.

With him, James Neeson; Thos. R. Bowden, Attorney General of Virginia.

CHASE, Circuit Justice. This is an appeal from an order of discharge from imprisonment made by the district judge acting as a judge of the circuit court, upon a writ of habeas corpus, allowed upon the petition of Caesar Griffin. The petition alleged unlawful restraint of the petitioner, in violation of the constitution of the United States, by the sheriff of Rockbridge county, Virginia, in virtue of a pretended judgment rendered in the circuit court of that county by Hugh W. Sheffey, present and presiding therein as judge, though disabled from holding any office whatever by the fourteenth amendment of the constitution of the United States. Upon this petition a writ of habeas corpus was allowed and served, and the body of the petitioner, with a return showing the cause of detention, was produced by the sheriff, in conformity with its command.

The general facts of the case, as shown to the district judge, may be briefly stated as follows:

The circuit court of Rockbridge county is a court of record of the state of Virginia, having civil and criminal jurisdiction. In this court, the petitioner, Caesar Griffin, indicted in the county court for shooting with intent to kill, was regularly tried, in pursuance of his own election; and, having been convicted, was sentenced according to the finding of the jury, to imprisonment for two years, and was in the custody of the sheriff to be conveyed to the penitentiary, in pursuance of this sentence.

Griffin is a colored man; but there was no allegation that the trial was not fairly conducted, or that any discrimination was made against him, either in indictment, trial, or sentence, on account of color. It was not claimed that the grand jury, by which he was indicted, or the petit jury, by which he was tried, was not in all respects, lawful and competent. Nor was it alleged that Hugh W. Sheffey, the judge who presided at the trial, and pronounced the sentence, did not conduct the trial with fairness and uprightness.

One of the counsel for the petitioner, indeed, upon the hearing in this court, pronounced an eulogium upon his character, both as a man and as a magistrate, to deserve which might well be the honorable aspiration of any judge.

But it was alleged and was admitted that Judge Sheffey, in December, 1849, as a member of the Virginia house of delegates, took an oath to support the constitution of the United States, and also that he was a member of the legislature of Virginia in 1862, during the late Rebellion, and as such voted for measures to sustain the so-called Confederate States in their war against the United States; and it was claimed in behalf of the petitioner, that he thereby became, and was at the time of the trial of the petitioner, disqualified to hold any office, civil or military, under the United States, or under

any state, and it was specially insisted that the petitioner was entitled to his discharge upon the ground of the incapacity of Sheffey, under the fourteenth amendment, to act as judge and pass sentence of imprisonment. Upon this showing and argument, it was held by the district judge that the sentence of Caesar Griffin was absolutely null; that his imprisonment was in violation of the constitution of the United States, and an order for his discharge from custody was made accordingly.

The general question to be determined on the appeal from this order is whether or not the sentence of the circuit court of Rockbridge county must be regarded as a nullity because of the disability to hold any office under the state of Virginia, imposed by the fourteenth amendment, on the person, who, in fact, presided as judge in that court. It may be properly borne in mind that the disqualification did not exist at the time that Sheffey became judge. When the functionaries of the state government existing in Virginia at the commencement of the late Civil War took part, together with a majority of the citizens of the state, in rebellion against the government of the United States, they ceased to constitute a state government_for the state of Virginia, which could be recognized as such by the national government. Their example of hostility to the Union, however, was not followed throughout the state. In many counties, the local authorities and majority of the people adhered to the national government; and representatives from these counties soon after assembled in convention at Wheeling, and organized a government for the state. This government was recognized as the lawful government of Virginia by the executive and legislative departments of the national government; and this recognition was conclusive upon the judicial department. The government of the state thus recognized was in contemplation of law the government of the whole state of Virginia, though excluded, as the government of the United States was itself excluded, from the greater portion of the territory of the state. It was the legislature of the reorganized state which gave the consent of Virginia to the formation of the state of West Virginia. To the formation of that state, the consent of its own legislature, and of the legislature of the state of Virginia, and of congress, was indispensable. If either had been wanting, no state, within the limits of the old, could have been constitutionally formed; and it is clear that if the government instituted at Wheeling was not the government of the whole state of Virginia, no new state has ever been constitutionally formed within her ancient boundaries. It can not admit of question, then, that the government which consented to the formation of the state of West Virginia, remained in all national relations the government of Virginia, although that event

reduced to very narrow limits the territory acknowledging its jurisdiction, and not controlled by insurgent force. Indeed, it is well known historically that the state and the government of Virginia, thus organized, was recognized by the national government. Senators and representatives from the state occupied seats in congress, and when the insurgent force which held possession of the principal part of the territory was overcome, and the government recognized by the United States was transferred from Alexandria to Richmond, it became in fact what it was before in law, the government of the whole state. As such it was entitled, under the constitution, to the same recognition and respect, in national relations, as the government of any other state.

It was under this government that Hugh W. Sheffey was, on February 22, 1866, duly appointed judge of the circuit court of Rockbridge county, and he was in the regular exercise of his functions as such when Griffin was tried and sentenced.

More than two years had elapsed after the date of his appointment, when the ratification of the fourteenth amendment, by the requisite number of states, was officially promulgated by the secretary of state, on July 28, 1868. That amendment, in its third section, ordains that "no person shall be a senator or representative in congress, or elector of president and vice-president, or hold any office, civil or military, under the United States, or under any state, who, having previously taken an oath as a member of congress, or as an officer of the United States, or as a member of any state legislature, or as an executive or judicial officer of any state, to support the constitution of the United States, shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof."

And it is admitted that the office held by Judge Sheffey, at the time of the trial of Griffin, was an office under the state of Virginia, and that he was one of the persons to whom the prohibition to hold office pronounced by the amendment applied.

The question to be considered, therefore, is whether upon a sound construction of the amendment, it must be regarded as operating directly, without any intermediate proceeding whatever, upon all persons within the category of prohibition, and as depriving them at once, and absolutely, of all official authority and power.

One of the counsel for the petitioner suggested that the amendment must be construed with reference to the act of 1867, which extends the writ of habeas corpus to a large class of cases in which the previous legislation did not allow it to be issued. And it is proper to say a few words on this suggestion here.

The judiciary act of 1789 expressly denied the benefit of the writ of habeas corpus to prisoners not confined under or by color of

the authority of the United States. Under that act, no person confined under state authority could have the benefit of the writ. Afterwards, in 1833 and 1842, the writ was extended to certain cases specially described, of imprisonment under state process; and in 1867, by the act to which the counsel referred, the writ was still further extended "to all cases where any person may be restrained of liberty in violation of the constitution, or of any treaty or law of the United States." And the learned counsel was doubtless correct in maintaining, that without the act of 1867, there would be no remedy by habeas corpus in the case of the petitioner, nor indeed in any case of imprisonment in violation of the constitution of the United States, except in the possible case of an imprisonment, not only within the provisions of this act, but also within the provisions of some one of the previous acts of 1789, 1833, and 1842.

But if, in saying that the amendment must be construed with reference to the act, the counsel meant to affirm that the existence of the act throws any light whatever upon the construction of the amendment, the court is unable to perceive the force of his observation. It is not pretended that imprisonment for shooting, with intent to kill, is unconstitutional, and it will hardly be affirmed that the act of 1867 throws any light whatever upon the question, whether such imprisonment, in any particular case, is unconstitutional. The case of unconstitutional imprisonment must be established by appropriate evidence. It can not be inferred from the existence of a remedy for such a case. And, surely, no construction, otherwise unwarranted, can be put upon the amendment more than upon any other provision of the constitution, to make a case of violation out of acts which otherwise must be regarded as not only constitutional, but right.

We come, then, to the question of construction. What was the intention of the people of the United States in adopting the fourteenth amendment? What is the true scope and purpose of the prohibition to hold office contained in the third section?

The proposition maintained in behalf of the petitioner, is, that this prohibition, instantly, on the day of its promulgation, vacated all offices held by persons within the category of prohibition, and made all official acts, performed by them, since that day, null and void.

One of the counsel sought to vindicate this construction of the amendment, upon the ground that the definitions of the verb "to hold," given by Webster in his Dictionary, are "to stop; to confine; to restrain from escape; to keep fast; to retain;" of which definitions, the author says that "to hold rarely or never signifies the first act of siezing or falling on, but the act of retaining a thing when seized on or confined."

The other counsel seemed to be embarrassed by the difficulties of this literal construction, and sought to establish a distinction between sentences in criminal cases, and judgments and decrees in civil cases. He admitted, indeed, that the latter might be valid when made by a court held by a judge within the prohibitive category of the amendment; but insisted that the sentences of the same court in criminal cases must be treated as nullities.

The ground of the distinction, if we correctly apprehend the argument, was found in the circumstance that the act of 1867 provided a summary redress to the latter class of cases; while in the former, no summary remedy could be had, and great inconvenience would arise from regarding decrees and judgments as utterly null and without effect.

But this ground of distinction seems to the court unsubstantial. It rests upon the fallacy already commented on. The amendment makes no such distinction as is supposed. It does not deal with cases, but with persons. The prohibition is general. No person in the prohibitive category can hold office. It applies to all persons, and to all officers under the United States, or any state. If upon a true construction, it operates as a removal of a judge, and avoids all sentences in criminal cases, pronounced by him after the promulgation of the amendment, it must be held to have the effect of removing all judges and officers, and annulling all their official acts after that date.

The literal construction, therefore, is the only one upon which the order of the learned district judge, discharging the prisoner, can be sustained; and was, indeed, as appears from his certificate, the construction upon which the order was made. He says expressly, "the right of the petitioner to his discharge appeared to me to rest solely on the incapacity of the said Hugh W. Sheffey, to act (that is, as judge), and so to sentence the prisoner under the fourteenth amendment."

Was this a correct construction? In the examination of questions of this sort, great attention is properly paid to the argument from inconvenience. This argument, it is true, can not prevail over plain words or clear reason. But, on the other hand, a construction, which must necessarily occasion great public and private mischief, must never be preferred to a construction which will occasion neither, or neither in so great degree, unless the terms of the instrument absolutely require such preference. Let it then be considered what consequences would spring from the literal interpretation contended for in behalf of the petition.

The amendment applies to all the states of the Union, to all offices under the United States or under any state, and to all persons in the category of prohibition, and for all time present and future. The offenses, for which exclusion from office is denounced, are not merely engaging in insurrection or rebellion against the United States, but the

giving of aid or comfort to their enemies. They are offenses not only of civil but of foreign war.

Now, let it be supposed that some of the persons, described in the third section, during the war with Mexico, gave aid and comfort to the enemies of their country, and, nevertheless, held some office on July 28, 1868, or subsequently.

Is it a reasonable construction of the amendment which will make it annul every official act of such an officer? But, let another view be taken. It is well known that many persons, engaged in the late Rebellion, have emigrated to states which adhered to the national government, and it is not to be doubted that not a few among them, as members of congress, or officers of the United States, or as members of state legislatures, or as executive or judicial officers of a state, had before the war taken an oath to support the constitution of the United States. In their new homes, capacity, integrity, fitness, and acceptability, may very possibly have been more looked to than antecedents. Probably some of these persons have been elected to office in the states which have received them.

It is not unlikely that some of them held office on July 28, 1868. Must all their official acts be held to be null under the inexorable exigencies of the amendment? But the principal intent of the amendment was, doubtless, to provide for the exclusion from office, in the lately insurgent states, of all persons within the prohibitive description.

Now, it is well known that before the amendment was proposed by congress, governments acknowledging the constitutional supremacy of the national government had been organized in all these states. In some, these governments had been organized through the direct action of the people, encouraged and supported by the president, as in Tennessee, Louisiana, and Arkansas, and in some through similar action in pursuance of executive proclamations, as in North Carolina, Alabama, and several other states. In Virginia, such a state government had been organized as has been already stated, soon after the commencement of the war; and this government had been fully recognized by congress, as well as by the president.

This government, indeed, and all the others, except that of Tennessee, were declared by congress to be provisional only. But, in all these states all offices had been filled, before the ratification of the amendment, by citizens who, at the time of the ratification, were actively engaged in the performance of their several duties. Very many, if not a majority of these officers, had, in one or another of the capacities described in the third section, taken an oath to support the constitution, and had afterwards engaged in the late Rebellion; and most, if not all of them continued in the discharge of their functions after the promulgation of the amendment, not supposing that by its operation their offices could be vacated without some action of congress.

If the construction now contended for be given to the prohibitive section, the effect must be to annul all official acts performed by these officers. No sentence, no judgment, no decree, no acknowledgment of a deed, no record of a deed, no sheriff's or commissioner's sale—in short no official act—is of the least validity. It is impossible to measure the evils which such a construction would add to the calamities which have already fallen upon the people of these states.

The argument from inconveniences, great as these, against the construction contended for, is certainly one of no light weight. But there is another principle which, in determining the construction of this amendment, is entitled to equal consideration with that which has just been stated and illustrated. It may be stated thus: Of two constructions, either of which is warranted by the words of an amendment of a public act, that is to be preferred which best harmonizes the amendment with the general terms and spirit of the act amended. This principle forbids a construction of the amendment, not clearly required by its terms, which will bring it into conflict or disaccord with the other provisions of the constitution.

And here it becomes proper to examine somewhat more particularly the character of the third section of the amendment. The amendment itself was the first of the series of measures proposed or adopted by congress with a view to the reorganization of state governments acknowledging the constitutional supremacy of the national government, in those states which had attempted to break up their constitutional relations with the Union, and to establish an independent Confederacy.

All citizens who had, during its earlier stages, engaged in or aided the war against the United States, which resulted inevitably from this attempt, had incurred the penalties of treason under the statute of 1790 [1 Stat. 112].

But, by the act of July 17, 1862 [12 Stat. 589], while the Civil War was flagrant, the death penalty for treason, committed by engaging in rebellion, was practically abolished. Afterwards, in December, 1863, full amnesty, on conditions which now certainly seem to be moderate, was offered by President Lincoln, in accordance with the same act of congress; and after organized resistance to the United States had ceased, amnesty was again offered in accordance with the same act by President Johnson, in May, 1865. In both these offers of amnesty extensive exceptions were made.

In June, 1866, little more than a year later, the fourteenth amendment was proposed; and was ratified in July, 1868. The only punitive section contained in it is the third, now under consideration. It is not improbable

that one of the objects of this section was to provide for the security of the nation and of individuals, by the exclusion of a class of citizens from office; but it can hardly be doubted that the main purpose was to inflict upon the leading and most influential characters who had been engaged in the Rebellion, exclusion from office as a punishment for the offense.

It is true that in the judgment of some enlightened jurists, its legal effect was to remit all other punishment. And such certainly was its practical effect, for it led to the general amnesty of December 25, of the same year, and to the order discontinuing all prosecutions for crime, and proceedings for confiscation originating in the Rebellion. But this very effect shows distinctly its punitive character.

Now it is undoubted that those provisions of the constitution which deny to the legislature power to deprive any person of life, liberty, or property, without due process of law, or to pass a bill of attainder or an ex post facto, are inconsistent in their spirit and general purpose with a provision which, at once without trial, deprives a whole class of persons of offices held by them, for cause, however grave. It is true that no limit can be imposed on the people when exercising their sovereign power in amending their own constitution of government. But it is a necessary presumption that the people in the exercise of that power, seek to confirm and improve, rather than to weaken and impair the general spirit of the constitution.

If there were no other grounds than these for seeking another interpretation of the amendment than that which we are asked to put upon it, we should feel ourselves bound to hold them sufficient. But there is another and sufficient ground, and it is this, that the construction demanded in behalf of the petitioner, is nugatory except for mischief.

In the language of one of the counsel, "the object had in view by us is not to unseat Hugh W. Sheffey, and no judgment of the court can effect that." Now the object of the amendment is to unseat every officer, whether judicial or executive, who holds civil or military office in contravention of the terms of the amendment. Surely a construction which fails to accomplish the main purpose of the amendment, and yet necessarily works the mischief and inconveniences which have been described, and is repugnant to the first principles of justice and right embodied in other provisions of the constitution, is not to be favored, if any other reasonable construction can be found.

Is there, then, any other reasonable construction? In the judgment of the court there is another, not only reasonable, but very clearly warranted by the terms of the amendment, and recognized by the legislation of congress. The object of the amendment is to exclude from certain offices a cer-

tain class of persons. Now, it is obviously impossible to do this by a simple declaration, whether in the constitution or in an act of congress, that all persons included within a particular description shall not hold office. For, in the very nature of things, it must be ascertained what particular individuals are embraced by the definition, before any sentence of exclusion can be made to operate. To accomplish this ascertainment and ensure effective results, proceedings, evidence, decisions, and enforcements of decisions, more or less formal, are indispensable; and these can only be provided for by congress.

Now, the necessity of this is recognized by the amendment itself, in its fifth and final section, which declares that "congress shall have power to enforce, by appropriate legislation, the provision of this article."

There are, indeed, other sections than the third, to the enforcement of which legislation is necessary; but there is no one which more clearly requires legislation in order to give effect to it. The fifth section qualifies the third to the same extent as it would if the whole amendment consisted of these two sections. And the final clause of the third section itself is significant. It gives to congress absolute control of the whole operation of the amendment. These are its words: "But congress may, by a vote of two-thirds of each house, remove such disability." Taking the third section then, in its completeness with this final clause, it seems to put beyond reasonable question the conclusion that the intention of the people of the United States, in adopting the fourteenth amendment, was to create a disability, to be removed in proper cases by a two-thirds vote, and to be made operative in other cases by the legislation of congress in its ordinary course. This construction gives certain effect to the undoubted intent of the amendment to insure the exclusion from office of the designated class of persons, if not relieved from their disabilities, and avoids the manifold evils which must attend the construction insisted upon by the counsel for the petitioner.

It results from the examination that persons in office by lawful appointment or election before the promulgation of the fourteenth amendment, are not removed therefrom by the direct and immediate effect of the prohibition to hold office contained in the third section; but that legislation by congress is necessary to give effect to the prohibition, by providing for such removal. And it results further that the exercise of their several functions by these officers, until removed in pursuance of such legislation, is not unlawful.

The views which have been just stated receive strong confirmation from the action of congress and of the executive department of the government. The decision of the district judge, now under revision, was made in December, 1868, and two months after-

wards, in February, 1869 [15 Stat. 344], congress adopted a joint resolution entitled "a resolution respecting the provisional governments of Virginia and Texas." In this resolution it was provided that persons, "holding office in the provisional governments of Virginia and Texas," but unable to take and subscribe the test oath prescribed by the act of July 2, 1862 [12 Stat. 502], except those relieved from disability, "be removed therefrom;" but a provision was added, suspending the operation of the resolution for thirty days from its passage.

The joint resolution was passed and received by the president on February 6, and not having been returned in ten days, became a law without his approval.

It can not be doubted that this joint resolution recognized persons unable to take the oath required, to which class belonged all persons within the description of the third section of the fourteenth amendment, as holding office in Virginia at the date of its passage, and provided for their removal from office.

It is not clear whether it was the intent of congress that this removal should be effected in Virginia by the force of the joint resolution itself, or by the commander of the first military district. It was understood by the executive or military authorities as directing the removal of the persons described, by military order. The resolution was published by command of the general of the army for the information of all concerned, March 22, 1869. It had been previously published by direction of the commander of the first military district, accompanied by an order, to take effect on March 18, 1869, removing the persons described from office. The date at which this order was to take effect, was afterwards changed to March 21.

It is plain enough from this statement that persons holding office in Virginia, and within the prohibition of the fourteenth amendment, were not regarded by congress, or by the military authority, in March, 1869, as having been already removed from office.

It is unnecessary to discuss here the question whether the government of Virginia, which seems to have been not provisional, but permanent, when transferred from Alexandria to Richmond, became provisional under the subsequent legislation of congress, or to express any opinion concerning the validity of the joint resolution, or of the proceedings under it. The resolution and proceedings are referred to here only for the purpose of showing that the amendment had not been regarded by congress or the executive, so far as represented by the military authorities, as effecting an immediate removal of the officers described in the third section.

After the most careful consideration, therefore, I find myself constrained to the conclusion that Hugh W. Sheffey had not been removed from the office of judge at the time of the trial and sentence of the petitioner;

and that the sentence of the circuit court of Rockbridge county was lawful. In this view of the case, it becomes unnecessary to determine the question relating to the effect of the sentence of a judge de facto, exercising the office with the color, but without the substance of right. It is proper to say, however, that I should have no difficulty in sustaining the custody of the sheriff, under sentence of a court held by such a judge.

Instructive argument and illustration of this branch of the case might be derived from an examination of those provisions of the constitution ordaining that no person shall be a representative or senator, or president, or vice-president, unless having certain pre-prescribed qualifications. These provisions, as well as those which ordain that no senator or representative shall, during his term of service, be appointed to any office under the United States, under certain circumstances, and that no person holding any such office shall, while holding such office, be a member of either house, operate on the capacity to take office. The election or appointment itself is prohibited and invalidated; and yet no instance is believed to exist where a person has been actually elected, and has actually taken the office, notwithstanding the prohibition, and his acts, while exercising its functions, have been held invalid.

But it is unnecessary to pursue the examination. The cases cited by counsel cover the whole ground, both of principle and authority. Taylor v. Skrine, 2 Tread. Const. 696; State v. Bloom, 17 Wis. 521; People v. Bangs, 24 Ill. 184. This subject received the consideration of the judges of the supreme court at the last term, with reference to this and kindred cases in this district, and I am authorized to say that they unanimously concur in the opinion that a person convicted by a judge de facto acting under color of office, though not de jure, and detained in custody in pursuance of his sentence, can not be properly discharged upon habeas corpus.

It follows that the order of the district judge must be reversed, and that the petitioner must be remanded to the custody of the sheriff of Rockbridge county.